Springer, J.,
dissenting:
Kriseya Labastida stands convicted of murder and is serving a life sentence in prison for murdering her infant son when it is *1516 clear from this record that she did not murder her son. The child was murdered by his father, who claims, without contradiction, that he killed the child and that he did so without the mother’s having any knowledge of the murder. This is the most tragic miscarriage of justice that I have had the misfortune to witness in my close-to-sixteen years on this court.
The undisputed facts of this case are plain: The convicted Kriseya Labastida was trapped in an abusive relationship with one Michael Strawser, the murderer of her infant son. Michael Strawser pleaded guilty to first-degree murder and testified that he went to great lengths to keep his abuse of the child and the actual killing of the child a secret from the child’s mother. Strawser has insistently maintained throughout these proceedings that the mother had no reason to believe that he might kill her son or otherwise injure him: The record is crystal clear in one respect: the mother did not, herself, abuse her son, nor did she aid or condone Strawser’s abusing or killing the child.[1] The only fault that can possibly be attributed to this mother is the claim that, under the circumstances of this case, she should have known about the way Strawser was treating the child in her absence and, therefore, should have been able to predict that Strawser would murder her child and that she should have been able, in some way, to prevent the murder.
The record belies any conclusion that Ms. Labastida should have been able to predict that Strawser was going to beat her child to death while she was away at work; but even if this were the case, she would be subject to conviction for child neglect only, and certainly not for the murder of her son, who was admittedly murdered by another person.
It is legally and factually impossible for Kriseya Labastida to have committed murder. To understand how this nightmare came to life, it is necessary to review several incidents of this case that do not come to light in the majority opinion. I have given considerable attention to “Appellant’s Proper Person Supplemental Brief,” which was filed September 14, 1995. For whatever reasons, no response to this brief has been filed by the State.[2]1 *1517 take it that the following discussion, taken from the brief, represents an accurate summary of the essence of this case. Because of the convincing and sometimes eloquent manner in which Ms. Labastida’s brief characterizes the facts of this case, I quote at some length:
On January 9, 1993, Kriseya J. Labastida’s fifty-day old baby died after two or three weeks of secret abuse by his father. While still in shock she tried to help the police discover what happened. Because she stated disbelief that her child could have been abused when she was always with him, she was charged with investigation of child neglect by the Deputy District Attorney on duty [present District Attorney Richard Gammick]. [My emphasis.]
The District Attorney election was nearing. D.A. Dorothy Nash Holmes, who fired over 80% of her staff, was at odds with the legal community and in a dispute with a judge, was combating bad press to win back alienated voters. Reno, Nevada had suffered many cases of child abuse. Nearing election, the D.A. coincidentally declared she would base her re-election on prosecuting child abusers. Labastida was a convenient target for this political plan. After 3 days in jail, barely grasping her baby’s death or why she was charged, Mrs. Holmes personally ordered Kriseya’s charges raised to first degree murder, child abuse and neglect or endangerment causing substantial bodily harm, in spite of a total lack of further evidence. Within days, the D.A. declared she would personally prosecute Labastida — the only criminal trial she undertook since taking office in 1990.
If not for political aspirations, it’s difficult to fathom why Mrs. Holmes chose Labastida’s case, considering that in all the preceding years, when many Anglo women were inculpated in abuse and murder, she never personally prosecuted even one. In roughly 95% of prior cases, the mother was only charged with neglect or abuse even where it was proved she either caused or directly participated in the death. In fact, in those cases, the father usually got a life sentence, but the mother received no more than ten years, average. The D.A.’s choice of this case, singling Kriseya out for murder, *1518 first degree, then a death penalty, raises serious questions about motives; more so, when the testimony and facts were that Kriseya did not cause, aid or abet inflicting any harm. Also puzzling is why testimony by Judge Mills Lane, who spoke before the committee which revised the child abuse and murder statute in 1989, was disregarded. He testified for the defense that to charge murder there must be evidence of an act by the accused — totally lacking in this case. The Deputy D.A. who originally charged Labastida, subpoenaed also, could not testify for her because Judge Stone ruled in favor of the D.A., based on attorney-client privilege. When a District Attorney selectively prosecutes someone because of racial and/or political reasons, the public has every just cause to question the integrity of the justice system. (Exhibits in Appendix)
Our American justice system rests on the cornerstone of public confidence. Those who administer and enforce justice must have unquestionable motives and integrity and be above reproach. Severe scrutiny must be given to any seeming improprieties.
The many questions raised in the Labastida case merit judicial review: that Mrs. Holmes never tried a case until election neared; that her re-election platform was to punish child abusers; that she never before charged murder, much less the death penalty, against a mother who did not personally cause a child’s death. This pattern of acts suggests that Mrs. Holmes unscrupulously abused her authority, prosecuting Labastida for political ambition.
Questions about selective prosecution and political motives are properly raised in an evidentiary hearing and are not presented infra, but we pray that this Honorable Court will review those factors that may undermine public confidence in the justice system.
After Labastida was sentenced to maximum prison terms — life plus twenty years consecutive — one of her trial jurors, Mr. George Kamp, expressed outrage over her sentence, saying Judge Stone’s questionable instructions were responsible for a verdict he would not have otherwise given. [3]
In her brief, Ms. Labastida claims that her Due Process rights *1519 were violated when the trial judge refused, on the ground of attorney-client privilege to permit then-Deputy District Attorney Gammick, now District Attorney Gammick, to testify as a defense witness. Ms. Labastida claimed that through Mr. Gammick’s testimony “she would have been able to present a prima facie showing of selective prosecution by Holmes, who used her case for political expediency.” The trial judge’s refusing to permit Mr. Gammick to testify was, of course, erroneous on its face. There is no “attorney-client” privilege that would justify the court’s refusal to permit Mr. Gammick from testifying on the subject of selective prosecution or from testifying on the inappropriateness, based on his investigation of the case, of the District Attorney’s filing first-degree murder charges against Ms. Labastida. My own view of the case is that there is no acceptable explanation of why the district attorney made a capital case out of this case or why she announced that she was going to try to put this grieving mother in the death chamber. There is no explanation other than the explanation offered by Ms. Labastida, namely, that the district attorney was making political capital out of a capital case.
There are seven reasons why the murder conviction should be reversed and the case remanded for retrial on the conviction of child neglect. First, I see the trial court’s refusal to permit then-Deputy District Attorney Gammick to testify on selective prosecution and prosecutorial misconduct as being a denial of Ms. Labastida’s Due Process rights. Second, there is no legal or factual basis for a murder charge or conviction. Third, Ms. Labastida’s acquittal of first-degree murder by child abuse precludes her being convicted of second-degree murder. Fourth, the Information is fatally defective. Fifth, the jury was not adequately instructed that in order to convict Ms. Labastida of child neglect, it was necessary for the State to prove that she had some knowledge that her son was in danger. Sixth, a member of the prosecutorial team engaged in conversations with the jury during the trial. Seventh, either the district court or the district attorney sent or allowed to be sent an excluded and extremely prejudicial exhibit into the hands of the jury during its deliberations.
I.

DENIAL OF DUE PROCESS IN EXCLUDING TESTIMONY OF DEPUTY GAMMICK

Deputy District Attorney Gammick’s offered testimony relating to Ms. Holmes’ motives for personally taking over this case could not have been properly excluded on the ground of attorney-client privilege. Of course, at this stage, we have no way of knowing the proposed content of Mr. Gammick’s testimony. We do have *1520 the claim in Ms. Labastida’s brief that he was going to testify concerning selective prosecution, apparently based on Ms. Labastida’s claims of political ambition and racial discrimination. I think that Ms. Labastida was entitled to explore these ramifications of her case as well as Mr. Gammick’s direct knowledge of the course of this prosecution as it related to the crime and the charging process. There might possibly have been some kind of executive privilege to be asserted, but certainly there was no attorney-client relationship between Ms. Holmes and Mr. Gammick. The court erred by excluding this constitutionally-oriented testimony.
II.

NO BASIS IN THE RECORD FOR A MURDER CHARGE OR CONVICTION

The record contains no basis here for a murder charge, capital or otherwise. At the very most, Ms. Labastida was guilty of child neglect; and it was a most extravagant prosecutorial overkill for the district attorney to seek the death penalty in this case.
A totally impartial reader of this record, one divorced entirely from all of the politically-charged facets of the case — a district attorney seeking reelection, a minority defendant, the “politically correct” hard-on-crime stance that must be affected by all elected officials, whether executive, legislative or judicial[4]— would have no difficulty at all in seeing that this is not a murder case.
In all societies, murder is treated differently from other crimes. A “malicious” taking of another’s life calls for the most serious of penalties, death, or life imprisonment. Under our statutes, murder can be committed either with “express malice” (a “deliberate intention” to take another’s life) or with “implied malice” (an “abandoned and malignant heart”).[5] No one has suggested that Ms. Labastida intentionally killed her son. In fact, no one has suggested that she killed him at all. If we were to search for some possible basis for a murder charge in this case it *1521 would have to rest on proof of implied malice — that Ms. Labastida possessed an “abandoned and malignant heart.”
Now, of course, no one (least of all Ms. Labastida) has the slightest notion as to what means “abandoned and malignant heart”; but, we do have case law that elaborates on the meaning of implied malice and, consequently, on the meaning of the archaic term employed in the statute. Sheriff v. Morris, 99 Nev. 109, 118, 659 P.2d 852, 859 (1983), teaches us:
[A] felony which would support the application of this second degree felony murder rule, would have to be one which is inherently dangerous when viewed in the abstract. There can be no deterrent value in a second degree felony murder rule unless the felony is inherently dangerous since it is necessary that a potential felon foresees the possibility of death or injury ....
(My emphasis.)
Under the “second degree murder rule” just quoted, an accused may be found guilty of second-degree murder if he/she engages in “inherently dangerous” conduct “that a potential felon foresees” will result in death or mortal injury. (My emphasis.) Law school illustrations of inherently dangerous conduct that will foreseeably result in death or mortal injury are irresponsible and reckless conduct such as the shooting of a cannon during the Times Square New Year’s Eve celebration or dropping heavy objects from the top of a city building during the rush hour. The accused in such cases cannot complain, “I did not intend to kill any one,” because creating these kinds of “foreseeable” risks makes the unintentional killer criminally liable for felonious homicide, murder, or in some instances, manslaughter. “It all depends on the unacceptability of the risk and the actor’s culpability in creating it.”[6]
Murder accompanied by “implied malice,” is, then, an unintentional murder committed in the performance of a reckless or irresponsible act which, by its nature, is “inherently dangerous” and one in which the perpetrator “foresees the possibility of death or injury.” Morris, 99 Nev. at 118, 659 P.2d at 859. The trial court tried to capture the essence of implied malice when it instructed the jury (Instruction No. 26) that:
Implied malice may be found when:
1. The killing resulted from an intentional act.
2. The natural consequences of the act are dangerous to human life, and
*1522 3. [T]he act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.
Ms. Labastida had no opportunity to defend against an unintentional, “inherently dangerous,” implied malice kind of murder. As explained above, the act of which she was accused was that she “did willfully, unlawfully, and with malice aforethought, deliberation and premeditation, kill and murder or aid and abet . . . [Strawser] to kill and murder Thunder Michael Lightfoot Strawser.” There is nothing in the charging document that would put Ms. Labastida on notice that she was being charged with having committed a foreseeably dangerous act “with knowledge of the danger to, and with conscious disregard to human life.” If Ms. Labastida had known that this kind of murder was to be the thrust of the charges against her she would surely have taken a different approach to the case; but this is not the essence of my point here.
What strikes me is how clear it is that the court’s instruction does not apply to the facts in this case. There is no evidence to support a jury finding (1) that Strawser’s killing of this child “resulted from an intentional act” on the part of Ms. Labastida, or (2) that “the natural consequences” of Ms. Labastida’s intentional “act[s] are dangerous to human life” or (3) that the intentional, dangerous acts were “deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.” At worst, Ms. Labastida was guilty of faulty perception and faulty predictive powers. There is nothing in the record to suggest that Strawser’s killing of his son had anything to do with any “intentional act” on the mother’s part. There is nothing in the record to suggest that anything that Ms. Labastida did or did not do was inherently “dangerous to human life.” Finally, there is nothing that would support a jury’s finding that any supposed dangerous acts or omissions committed by Ms. Labastida were “deliberately performed” with knowledge that they were dangerous to her son’s life or performed with a “conscious disregard for” her son’s life. The whole idea that this mother “deliberately performed” some act that she knew would result in her child’s death or that she had a conscious disregard for her son’s life approached the absurd. Ms. Labastida cannot possibly stand convicted under the wording given to the jury in Instruction No. 26. It is no wonder a juror wrote to the newspaper that he had been “bothered” by his decision to “go along” with a second-degree murder conviction and that this “woman should not have been sentenced to life for something she did not do.”
The juror’s conviction that Ms. Labastida has been convicted *1523 for “something she did not do” is magnified when we consider what the district attorney told the jury about the nature of the critical issue in this case, implied malice.
The only real exposure that the jury got to the difficult concept of implied malice as it relates to second-degree murder came from fatally misleading statements made to the jury by District Attorney Holmes. The district attorney told the jury that it did not have to decide the question of malice based on the evidence and that there was a “conclusive presumption” of malice. Here is what Ms. Holmes had to say to the jury:
[T]he law permits the jury to imply malice instead of having to deduce it from the evidentiary finding beyond a reasonable doubt. Legal conclusive presumption once evidence shows insufficient provocation.
I must admit that Ms. Holmes’ statement to the jury makes no sense; still, this representation of the State clearly got the message across that the jury did not have to base its findings on implied malice on “the evidentiary finding beyond a reasonable doubt” and that there was a “legal conclusive presumption” of malice, once there was a showing of an undefined “insufficient provocation.” The force of Ms. Holmes’ argument is brought home by the note sent to the judge by the jury:
Can we get a transcript of D.A. Holmesf], second closing statement from l-19-94[?]
This request tells me that the jury was paying a lot of attention to Ms. Holmes’ closing arguments.
I have searched and searched in trying to understand how Ms. Labastida could possibly have been convicted of murder. The district attorney’s telling the jury that a finding of malice did not have to be based on the evidence and that there was a conclusive presumption of malice comes as close as anything to explaining the anomalous result in this case.
Aside from the wording of Instruction No. 26, it is very clear to me that there is nothing in the evidence to support a second-degree murder conviction based on implied malice. Second-degree murder convictions are almost always based on the use of a firearm or other “inherently dangerous” instrumentality; and it is anomalous indeed for us to affirm this murder conviction, which would appear, if it had any basis at all, to be based on negligence rather than malicious conduct.
This court has refused twice to permit reckless — even intoxicated — automobile driving to be the basis for second-degree murder charges. In Sheriff v. LaMotte, 100 Nev. 270, 680 P.2d 333 (1984), we affirmed the trial court’s granting habeas corpus to a defendant charged with murder in a vehicular homicide case. *1524 Even though the defendant had been driving in an intoxicated condition, we agreed with the trial court that this was not the kind of conduct that was “inherently dangerous in the abstract” and that would, therefore, support a murder charge based on implied malice. Id. at 272, 680 P.2d at 334; see also Johnston v. State, 101 Nev. 94, 692 P.2d 1307 (1995). For this court to hold, as it impliedly does in this case, that a mother’s supposed failure to predict that her son was going to be murdered by his father is inherently dangerous and the basis for a murder conviction is contrary to our cases and contrary to common justice.
III.

EFFECT OF MS. LABASTIDA’S MURDER ACQUITTAL

I am of the view that the jury’s acquittal on the primary charge, first-degree, child-abuse murder, of itself, forecloses Ms. Labastida’s present murder conviction.
At the same time the jury acquitted Labastida of first-degree, child-abuse murder, it found that she was guilty of child neglect. Child murder and child neglect are mutually inconsistent and irreconcilable terms; just as a person cannot be found guilty of murder and manslaughter for the same homicidal act. If we analyze the child-abuse, first-degree murder statute, this reality becomes even more obvious. The child-abuse murder statute is analogous to felony murder in that it is particularized and eliminates the traditional elements of first-degree murder: premeditation and deliberation. Not until 1989, when the legislature amended NRS.200.508(l)(b), did child-abuse murder become first-degree murder without the necessity of proving “willfulness, deliberation or premeditation.” After passage of the amendment, all child abuse which results in death is, without more, first-degree murder.
Child abuse, according to NRS 200.508 is committed by willfully causing a child to suffer unjustifiable physical pain or mental suffering or willfully placing a child “in a situation where the child may suffer physical pain or mental suffering as the result of abuse and neglect.” The jury exonerated Ms. Labastida from the charges that she had willfully caused her son pain or that she willfully placed him in a situation where “the child may suffer” pain. At the same time that the jury adjudicated Labastida’s innocence of child abuse, it found her guilty of child neglect or endangerment, which, by statute, does not involve the willful causing or permitting a child to suffer pain but, rather, relates only to custodial neglect by one “responsible for the safety or welfare of a child” who “permits or allows that child to suffer” pain.
*1525 The majority opinion states that the second-degree murder conviction in this case is supportable because the killing cannot be manslaughter. The majority’s argument appears to be: “Her son is dead. If she is not guilty of manslaughter, she must be guilty of murder.” This argument cannot be sustained. The involuntary manslaughter statute does, as stated in the majority, except from the definition of manslaughter conduct which “naturally tends to destroy the life of a human being”; but this adds nothing to the definition of implied malice and of second-degree murder, a crime that is defined by statute and elaborated in our cases.
Before leaving the subject of manslaughter, I want to point out that even though it is apparent that Ms. Labastida’s conduct does not fall into the range of felonious homicide of any description, certainly defense counsel should not have let the case go to the jury on a murder charge without requesting that the court give an instruction on involuntary manslaughter as a lesser offense. In my view, counsel’s failure to request an instruction on manslaughter in this case was ineffective assistance of counsel as a matter of law; but this is not the point that I make. My point here is simply to say that the majority’s reliance on the manslaughter statute to show what manslaughter is not does not detract from my position that a murder conviction cannot be based upon negligent conduct and conduct that does not “naturally tend[] to destroy” human life.
A conviction of second-degree murder of the neglectful Ms. Labastida is a legal impossibility. Ms. Labastida’s actions in this case most certainly do not support a finding that she acted with malice as it is defined in our criminal law.[7] As I have pointed out, *1526 second-degree murder cases ordinarily involve deaths that result from such inherently dangerous conduct as the misuse of dangerous instrumentalities or acts involving deadly weapons, or from conduct that is so inherently deadly and disregardful of human life that it is deemed to be evidence of “an abandoned and malignant heart.” In the face of the uncontradicted testimony of the murderer, Strawser, that he had been secretly abusing the child and had himself, alone, killed the child and that he did this in a manner intentionally devised to conceal his horrible deeds from the mother’s observation, a jury could not have properly concluded that any conduct on the part of Ms. Labastida “naturally tend[ed] to destroy human life.”
IV.

FAULTY CHARGING DOCUMENT

I have already touched on the defects in the criminal pleading in this case; but, because of the Due Process implications of the faulty Information, I will discuss this problem at greater length and set it up as an independent reason that reversal of this conviction is required.
I have set out the murder charges (Count I of the Information) in the margin.[8]1 have done this so the reader can get a flavor of *1527 criminal pleading at its worst. “Or” appears so many times in the two paragraphs of this count that it is impossible for Ms. Labastida or anyone else to understand with any degree of certainty just what acts Ms. Labastida is claimed to have committed. This alone is sufficient ground for reversing this murder conviction[9]; but, in order to make my main point — that murder is a legal impossibility in this case — I will pretend that there is some semblance of meaning to be found in this criminal pleading.
It is, as I have said, extremely difficult to discover from reading the Information just what acts were being charged as the basis for any kind of criminal liability on the part of Ms. Labastida. The best I can do with Count I (the only count on which a murder charge can possibly be based) of the Information is this: The essence of the charges made in Count I is that Ms. Labastida committed premeditated and deliberated murder — that Labastida and Strawser “together or individually” “did willfully, unlawfully, and with malice aforethought, deliberation and premeditation, kill and murder” or that they “aid[ed] and abetted] one another to kill and murder.” There are two paragraphs in Count I.
The first paragraph is, as suggested before {see footnote 8), virtually unintelligible; but if one strains to make sense out of it, it can be determined that Ms. Labastida is being charged either with an intentional killing (premeditated and deliberated) or with aiding and abetting a first-degree murder (admittedly committed by the father of the child, Michael Strawser). The jury acquitted Ms. Labastida of first-degree murder, that is to say, both child-abuse murder and premeditated and deliberated murder; therefore, Ms. Labastida’s conviction of second-degree, unintentional, unpremeditated, undeliberated murder cannot be based on the first-degree murder allegations contained in the first paragraph of Count I. The second-degree murder conviction must, then, be based, if at all, on the language contained in the second paragraph of Count I.
The second paragraph charges first-degree, child-abuse murder, not first-degree, premeditated murder (as is done in the first *1528 paragraph). The second paragraph charges that Ms. Labastida and Strawser either “together or individually” did actually “kill and murder” the child or “aid and abet one another” to kill (which is to say that either Ms. Labastida aided and abetted Strawser or Strawser aided and abetted Ms. Labastida to kill the child) either (1) in the furtherance of torture, (2) or in the furtherance of child abuse or (3) by actually “inflicting multiple trauma” or (4) by acting to “allow, permit or fail to restrain one another from inflicting multiple trauma.” Aside from the previously discussed problems relating to disjunctive charges, it is hard to locate which of the multiple possibilities (at least ten) are being relied on by the State to support a second-degree murder conviction. To sort this out, one must, first, eliminate the charges of torture and child abuse and the willful infliction of “multiple trauma” because second-degree murder does not encompass these kinds of intentional, homicidal acts. NRS 200.030 defines first-degree child-abuse murder in terms of torture, child abuse and premeditated and deliberate acts, adding that “all other murders shall be murder in the second degree.” Thus, torture, child abuse and premeditated murder are excluded from the ambit of second-degree murder convictions, and the only remaining charge in the second paragraph of Count I that can support a second-degree murder conviction is the charge that Strawser and Labastida “allow[ed], permit[ted] or fail[ed] to restrain one another from inflicting multiple trauma.”
Let us suppose, then, that we have finally isolated a charge against Ms. Labastida that has any relevance to a second-degree murder conviction. That would have to be the charge of allowing or permitting or failing to restrain Michael Strawser in his murderous activities. “Allowing” and “permitting” are ambiguous terms. These words could be read to mean either that Ms. Labastida “allowed” (in the sense of negligently failing to stop Strawser from injuring the child) the murder to happen, or it could mean that she was actively permitted or condoned or abetted Strawser’s murderous activities. If these words were taken to mean mere negligent failure to be vigilant, then they might support a child neglect charge but not a murder charge. If these words were taken to mean aiding and abetting the murder, we know that Ms. Labastida did not aid or abet Strawser in the killing of her son. I will discuss in the next portion of this dissent the adequacy of the child neglect charges and conviction; but let me say for now only that “permitting” or “allowing” will not support a murder charge.
We must keep in mind at all times that it has never been suggested that Ms. Labastida herself injured her child in any way and that the sole thrust of the prosecution’s murder case was that *1529 Ms. Labastida should have known what Strawser was up to and should have done something about it. In other words, the gist of the murder charge, if there is a murder charge, is that Ms. Labastida was negligent, that she was neglectful, that she failed to perform a duty that the law enjoined upon her. Such a breach of duty may constitute criminal child neglect, and in severe cases maybe even manslaughter[10]; but mere neglect can never be the basis of a murder conviction. The charge that Ms. Labastida neglectfully failed in her duty to protect her baby is a far cry from child abuse and a far cry from child murder. The only evidence upon which Ms. Labastida’s murder conviction can be based is that of neglect, and neglect is not enough to support a conviction of murder in any degree.
What must always be kept in mind is that the jury acquitted Ms. Labastida of child-abuse murder and found her guilty of child neglect only. Ms. Labastida has been adjudicated to be not guilty of “willful” child abuse as it relates to the death of her son. One thing is certain, and this is that child neglect cannot be the predicate for a murder conviction.
V.

DEFECTS IN THE CHARGES AND CONVICTION OF CHILD NEGLECT

Count III of the Information has the same problem as the murder charges in Count I, overuse of the disjunctive. The charge is that Ms. Labastida, a person responsible for the safety and welfare of her son, “willfully and unlawfully” did (1) “neglect or endanger” the child “by causing or allowing or permitting” the child to suffer unjustifiable physical pain or injury or mental suffering or (2) “did place Thunder in a situation where he suffered said physical pain or injury or mental suffering” or (3) “did neglect or fail to obtain proper medical care and treatment” for the child. We have no way of knowing which of the three charges was the basis for the conviction on Count III. Whether Ms. Labastida was convicted of neglecting the child by “causing or allowing or permitting” the child to suffer injury or of placing the child “in a situation where” he suffered pain or of neglecting to obtain medical care, the one essential element not known to the jury was the requirement that a person cannot be “criminally liable” for child neglect unless “she knows or has reason to know of abuse or neglect, yet permits the child to be *1530 subjected to it.” Smith v. State, 112 Nev. 1269, 927 P.2d 14 (1996).
In Smith, this court held that the child neglect statutes, NRS 200.508(1)(a) and NRS 200.508(l)(b), “when read as a whole . . . require knowledge or intent on the part of the actor as a prerequisite to finding guilt.” (My emphasis.) The court held that the “statutory definitions of ‘allow’ and ‘permit’ ... are not drafted as clearly as would be preferred, but they do establish with sufficient clarity the state of mind required to find guilt.” Smith, 112 Nev. at 1276, 927 P.2d at 18. Smith defines “allow” in terms that require the person violating the statute to “ ‘know or have reason to know’ of abuse or neglect” and defines “permit” so as to require that “a violator must act in a way that ‘a reasonable person’ would not.” The court in Smith went on to hold that “permit” and “allow” are to be read “in conjunction” and that “both definitions establish the same requirement,” namely, “a person acts unreasonably and is therefore criminally liable if she knows or has reason to know of abuse or neglect yet permits or allows the child to be subject to it.'''’ 112 Nev. at 1277, 927 P.2d at 18. (My emphasis.) In this way, Smith clarified the statutory “requirement of knowledge and reasonableness” which “defines the state of mind required for a finding of guilt and effectively precludes punishment for inadvertent and ignorant acts.” 112 Nev. at 1277, 927 P.2d at 18. “Knowledge” and “reasonableness” — Ms. Labastida must have known of the danger to her child; and she must have acted unreasonably upon that knowledge if she is to be held “criminally liable”; yet the jury did not know this. Ms. Labastida did not have the benefit of an instruction advising the jury on the “state of mind required for a finding of guilt” and this made her subject to “punishment for inadvertent and ignorant acts.”
If, for example, the jury decided to convict Ms. Labastida for (2) placing the child “in a situation where he suffered” pain, such a conviction would not be justified unless Ms. Labastida knew that she was placing her baby “in a situation” that was going to result in harm.
Instruction No. 35 told the jury that it was a violation of NRS 200.508 if Ms. Labastida had “placed [the child] in a situation where the child may suffer physical pain.” (My emphasis.) I do not think that there is any parent who has not, unwittingly, placed a child in a “situation where the child may suffer physical pain.” Neither the instruction nor the statute itself includes the necessary scienter, the knowledge that would lead a “reasonable person” to believe that harm was going to result to the child.
Instruction No. 30 defines “willfully” only in reference to acts or omissions which are done “intentionally, deliberately, or *1531 designedly.” Such definition does not cover the type of knowledge that is necessary to convict for child neglect. Ms. Labastida may have intentionally left her child in Strawser’s custody, but if she did not know of the danger she was placing her child in, then she cannot be convicted of child neglect. Virtually anyone could be convicted of child neglect under the instructions given to the jury. Every person who takes a child to a swimming pool or to an amusement park is placing the child in a situation where the child may suffer harm. These kinds of deliberate and intentional decisions do not constitute child neglect. The jury was never told what child neglect is, and therefore, it could not properly convict Ms. Labastida of this crime.
VI.

PROSECUTORIAL MISCONDUCT

As the State concedes in its answering brief, “it appears that one of the prosecutors made some comment regarding lunch to one of the jurors.” Appellant’s more general complaint is that a “deputy district attorney engaged in a conversation with one of the jurors while he was still in the jury box . . . .”
Whether the conversation was merely about “lunch,” the weather, or some other subject, the mere fact that a prosecutor is caught conversing with a juror in the jury box cannot be condoned. Trial counsel simply do not engage jurors in private conversation, either while the jurors are in the jury box or out of it. In my opinion, the trial court committed reversible error in not granting a mistrial for this prosecutorial misconduct.
With respect to the jury’s receiving an excluded State’s exhibit into the jury room, I have no basis for charging that it was the district attorney rather that the court clerk who was responsible for submitting for jury consideration a highly prejudicial exhibit that had been excluded from evidence, so I will discuss this ground for reversal next under the category of prejudicial clerical error.
VII.

PREJUDICIAL CLERICAL ERROR IN SUBMITTING PREJUDICIAL, EXCLUDED EXHIBIT TO THE JURY

My final disagreement with the majority opinion relates to the sending into the jury room of a prejudicial exhibit that the trial court had properly excluded from evidence as being not connected to either of the defendants in this case.
In some manner, the jurors received in the jury room a highly prejudicial exhibit in the form of a magazine in which there was a portrayal of a defaced baby, which defacement was, according to *1532 the district attorney, “representative of the sign of the devil,” namely, “a little goat beard drawn onto the baby, the arched eyebrows, the upside-down cross in the middle of the forehead . . . and the symbol of the devil ... an eye in the middle of the forehead and . . . horns . . . added onto the baby.” The pictorial defacement also bore the inscription “Devil Babies. Do You Have One?” The exhibit was without question extremely prejudicial, intimating that the defendants intentionally killed their “devil baby.” The trial judge refused to admit the offer into evidence, as urged by the district attorney.
Prior to its being unlawfully sent into the jury room, the jury was aware of the existence of this exhibit and had seen it at a distance during trial. The jury was also aware of the court’s obvious effort to conceal the exhibit from the jury during the testimony of Michelle Smith, the defendants’ landlady. The prejudicial effect of this exhibit was readily recognized by Frederick Brown, who discovered the exhibit. Brown, owner of the building where the murder took place, knew nothing of the murder but testified that he recognized the significance of such an item and immediately notified the police about it. That such a document was extremely prejudicial is just about beyond argument. The State argues, however, that no harm was done because the judge told the jury to disregard the exhibit. The court did not examine the jury to determine the extent of the prejudicial effect of the jury’s receiving this excluded exhibit in the jury room; and this is certainly not a case where a bland admonition to disregard will suffice to overcome the harm done by such an obviously prejudicial document.
I cannot understand how the clerk could possibly have sent this material into the jury room, and I suspect that this court attaché might have seen herself or himself as a member of the prosecu-torial team. In any event, an unconnected, defaced picture suggesting that the defendants had killed their child because it was a “devil baby” is about as prejudicial an item as I can possibly imagine.
Each of the seven prejudicial errors that I have discussed above warrants the reversal of these convictions. The murder conviction should be set aside, and the child-neglect conviction should be remanded for a retrial in which the defendant is given the benefit of properjury instructions.

I agree with Justice Shearing when she notes in her concurring opinion that there was “not one iota of evidence that Labastida inflicted one injury on the child” and that there is not ‘‘any evidence in the record” that would support a conviction for aiding and abetting Strawser’s murder of her son. It is also undeniably true, as put by Justice Shearing, that there “is substantial evidence that Labastida was concerned about the welfare of her child and took measures to see to his welfare.”

One possible explanation for the State’s not opposing the proper person brief is that counsel for the State, Richard Gammick, the present district attorney, has expressed his opinion publicly that this is not a murder case. Mr. Gammick was the deputy assigned to prosecute this case by then-District *1517 Attorney Dorothy Nash Holmes. At the time of the Strawser murder, Deputy District Attorney Gammick made the decision not to charge Ms. Labastida with murder. District Attorney Dorothy Nash Holmes took over the case, countermanded Mr. Gammick’s prosecutorial decision and filed murder charges. At Ms. Labastida’s trial, Mr. Gammick offered to testify that Ms. Labastida’s actions did not warrant the filing of murder charges. District Attorney Dorothy Nash Holmes was successful in excluding Mr. Gammick’s testimony on the ground that “it would violate the attorney-client privilege.”

On May 1, 1994, juror Kamp wrote to the Reno Gazette-Journal that the “abuse and torture” in the case was “committed the last 21 days of the baby’s life, and all done by the father.” He said that if he had known that Ms. Labastida was subject to such a sentence, he “would never have consented to” the murder conviction because, “She did not do the deed.” This repentant juror publicly proclaimed: “This woman should not have been sentenced to life for something she did not do. Justice is not equal.”

In a recent speech, United States Supreme Court Justice John Paul Stevens opined that the very worst of all of the bad incidents relating to the election of judges was the natural susceptibility of judges to be influenced unduly and unfairly in their judgments on criminal cases by the hard-on-crime political climate of the times. The Nevada Supreme Court is not immune from this unhappy influence on its decisions, an influence which I believe to be responsible for the clearly wrong and unjust decision that the court makes today.

NRS 200.020.

George Fletcher, Rethinking Criminal Law 259 (Little, Brown and Co. 1978).

The worst thing that Ms. Labastida can be said to have done is that she failed to remove her baby from contact with Strawser until it was too late. This is a typical case in which a woman has been trapped by fear by an abusive and dominating male figure. Her failure or inability to remove herself and her baby from Strawser’s household is indeed pitiable, but it is not murder.
It appears to me that the jury was in a sense instructed by the court to bring in a verdict of second-degree murder. Instruction No. 27 instructed the jury that if “the unlawful killing of a human being is done with malice aforethought . . . [and] is not perpetrated by means of torture, or child abuse, then the offense is murder in the second degree.” (My emphasis.) The jury was certainly entitled to find that Ms. Labastida’s neglect was “unlawful.” “Malice aforethought,” according to the trial judge, “could be based on the depraved heart theory,” referring to NRS 200.020(2) which defines “implied malice” as arising under circumstances in which “no considerable provocation appears or when all the circumstances of the killing show an abandoned and malignant heart.” It would appear, then, that Ms. Labastida was convicted for possessing an abandoned and malignant heart, whatever that might be. This kind of heart goes undefined in the court’s instruction. I believe that the jury concluded that “the unlawful killing” was not “perpetrated by *1526 means of torture or child abuse” so that “then the offense is murder in the second degree.” No effort was made to explain or define malice aforethought as it might apply in this case, and the jury was told in effect that Ms. Labastida should be convicted of second-degree murder. I consider this to be error in itself.

Count I of the Information reads as follows:
That the said defendants, KRISEYA J. LABASTIDA and MICHAEL ROBERT STRAWSER, together or individually, on or between the 4th day of December A.D. 1992, and the 9th day of January A.D. 1993, or thereabout, and before the filing of this Information, at and within the County of Washoe, State of Nevada, did willfully, unlawfully, and with malice aforethought, deliberation and premeditation, kill and murder or aid and abet one another to kill and murder THUNDER MICHAEL LIGHTFOOT STRAWSER, a baby seven weeks of age, by means of inflicting or allowing, permitting or failing to restrain one another from inflicting multiple and repeated trauma, internal injuries, bone fractures, abrasions and lacerations upon the said baby THUNDER MICHAEL LIGHTFOOT STRAWSER from which he died on January 9, 1993; or
that the said defendants, KRISEYA J. LABASTIDA and MICHAEL ROBERT STRAWSER, together or individually, did willfully and unlawfully and with malice aforethought, kill and murder or aid and abet one another to kill and murder THUNDER MICHAEL LIGHTFOOT STRAWSER, a baby seven weeks of age, during the commission of and in the furtherance of torture or child abuse, in that said defendants did inflict or allow, permit or fail to restrain one *1527 another from inflicting multiple trauma, internal injuries, bone fractures, abrasions and lacerations to the said baby THUNDER MICHAEL LIGHTFOOT STRAWSER, all of which caused or contributed to the death of said child on or about January 9, 1993.

A criminal accusation “ ‘must include a characterization of the crime and such description of the particular act alleged to have been committed by the accused as will enable [her] properly to defend against the accusation.’ ” Simpson v. District Court, 88 Nev. 654, 660, 503 P.2d 1125, 1129 (1972) (quoting 4 R. Anderson, Wharton’s Criminal Law and Procedure § 1760 at 553 (1957)).

The trial court refused Ms. Labastida’s request for a manslaughter instruction. This refusal was error and helps to explain why Ms. Labastida was incorrectly convicted of murder.