SHERIFF, CLARK COUNTY, NEVADA, Appellant, v.
DANA LINDSAY MORRIS, Respondent.

No. 12459

March 1, 1983                                    659 P.2d 852

*Robert J. Miller,* District Attorney, and *James N. Tufteland,* Deputy District Attorney, Clark County, for Appellant.

*Gerald F. Neal,* Las Vegas; *Morgan D. Harris,* Public Defender, *Robert D. Larsen,* Assistant Public Defender, and *Xavier Gonzales,* Deputy Public Defender, Clark County, for Respondent.

## OPINION

By the Court, STEFFEN, J.:

This appeal results from the district court's order granting the respondent's pretrial petition for writ of habeas corpus and discharging the respondent. We conclude that the district court erred as to the law but must affirm the granting of the writ on grounds of the insufficiency of the indictment.

In respect of this appeal, the following alleged facts are deemed relevant. On March 1, 1979, 17-year old Timothy Slotemaker died as a result of ingesting a lethal quantity of trichloral ethanol (a derivative of chloral hydrate).[1] The controlled substance in the form of tablets, was purchased by the decedent from the respondent, Dana Lindsay Morris (hereinafter "defendant"). During the early afternoon hours of that fateful date, Slotemaker, accompanied by two companions, went to defendant's trailer for the purpose of purchasing drugs. Defendant informed decedent that he had some "sodium pentathol or downers" for sale. Slotemaker purchased two pills which he ingested in defendant's presence with some beer furnished by defendant to help "wash down" the pills. Decedent then purchased one more pill which he consumed outside defendant's trailer as the three were leaving the premises. Approximately one-half hour later, Slotemaker and one of the companions returned to defendant's trailer. This time, Slotemaker obtained up to ten additional tablets from the defendant, several of which were again consumed in the presence of the defendant. Slotemaker died later that evening as a result of the drug overdose.

On March 10, 1979, the Clark County Grand Jury indicted the defendant for the murder of Timothy Slotemaker, for two counts of giving away a controlled substance, and for one count of sale of a controlled substance.

Defendant filed a petition for writ of habeas corpus on the basis that the portion of the indictment charging defendant with open murder was not sufficiently specific. Defendant's petition was granted by the lower court, and affirmed by this Court. The state was granted leave to refile the murder charge.

On July 31, 1979, the state filed a complaint charging the defendant with murder. Thereafter, on September 6, 1979, an indictment was filed against defendant accusing him of the

---

[1] A Schedule IV controlled substance under NRS 453.196.

crime of "MURDER (Felony NRS 200.010, 200.030, 200.070)."

This most recent indictment charged that the defendant, on March 1, 1979, "did then and there feloniously and without authority of law, kill and murder TIMOTHY A. SLOTE-MAKER, a human being, in the commission of an unlawful act, which, in its consequences naturally tended to destroy the life of a human being and/or was committed in the prosecution of a felonious intent in the following manner, to-wit: by giving away or selling to the said TIMOTHY A. SLOTEMAKER, a lethal quantity of a controlled substance to-wit: CHLORAL HYDRATE, the said TIMOTHY A. SLOTEMAKER thereafter ingesting said lethal quantity of CHLORAL HYDRATE, the ingestion of which caused the said TIMOTHY A. SLOTEMAKER to die of CHLORAL HYDRATE poisoning resulting from an overdose of CHLORAL HYDRATE which was a direct and proximate cause of the unlawful acts of the defendant DANA LINDSAY MORRIS described hereinabove."

The defendant responded to this indictment in part by filing a petition for a writ of habeas corpus with this Court. We ruled that the petition be heard by the district court, and the latter court granted the writ of habeas corpus and discharged the defendant, holding that the question of whether "an overdose resulting in death by a drug sale should be murder . . . should be decided by the legislature and not by the court . . . ."

This appeal followed.

The primary issue before us on appeal is whether, under the fact-specific circumstances of this case, a charge of second degree murder is authorized under Nevada law. The resolution of the issue is the product of the combined meaning of NRS 200.030, and NRS 200.070. The former statute reads, in pertinent part, as follows:

1. Murder of the first degree is murder which is:

(a) Perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing;

(b) Committed in the perpetration or attempted perpetration of sexual assault, kidnapping, arson, robbery, burglary or sexual molestation of a child under the age of 14 years; or

(c) Committed to avoid or prevent the lawful arrest of any person by a peace officer or to effect the escape of any person from legal custody.

As used in this subsection, sexual molestation is any willful and lewd or lascivious act, other than acts constituting the crime of sexual assault, upon or with the body,

or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions or sexual desires of the perpetrator or of the child.

   2.   Murder of the second degree is all other kinds of murder.

It is noted that the above statute clearly specifies those acts which are in the category of murder in the first degree. Under subsection (2) all other kinds of murder are of the second degree. The state argues that the latter subsection, read in conjunction with NRS 200.070, justifies the charge of murder against the respondent. NRS 200.070 provides:

Involuntary manslaugther shall consist in the killing of a human being, without any intent so to do, in the commission of an unlawful act, or a lawful act which probably might produce such a consequence in an unlawful manner; but *where such involuntary killing shall happen in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense shall be deemed and adjudged to be murder.* (Emphasis supplied.)[2]

The indictment of the respondent on the charge of murder was couched in the terms of the above quoted provision, the state urging culpability upon either (or both) of two grounds: (1) the homicide occurred during the "commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being," and/or (2) the killing was "committed in the prosecution of a felonious intent."

We turn first to the question of whether NRS 200.070, when read in conjunction with NRS 200.030, permits a charge of *second* degree murder under the felony-murder rule. Because the actions of the defendant do not come within those specified areas of first degree murder under NRS 200.030, the state argues that the defendant is criminally responsible under a second degree felony-murder theory.

This Court has long recognized the felony-murder rule in the context of *first* degree murder. "The felony-murder rule simply stated is that any homicide, committed while perpetrating or attempting a felony, is first degree murder." Payne v. State, 81

---

[2]NRS 200.070 is the applicable statute designated in effect in 1979, as quoted in this Opinion.

Nev. 503, 505, 406 P.2d 922 (1965), *cert. denied,* 391 U.S. 927 (1967). In *Payne,* this Court said:

> The original purpose of the felony-murder rule was to deter felons from killing negligently or accidentally by holding them strictly responsible for the killings that are the result of a felony or an attempted one. [Citations omitted.] In the majority of jurisdictions, such a homicide acquires first degree murder status without the necessity of proving premeditation and deliberation. The heinous character of the felony is thought to justify the omission of the requirements of premeditation and deliberation.

Under *Payne,* a direct causal connection between the commission of the underlying offense, and the resulting homicide is also required for the imposition of the rule. *Id.* at 506.

There appears to be no Nevada cases which address the felony-murder rule in the context of second degree murder.[3] California, however, has adopted a persuasive position supporting the concept of felony-murder in the second degree. In People v. Cline, 75 Cal.Rptr. 459 (Ct.App. 1969), the defendant, while visiting at the residence of the decedent, indicated that he had some phenobarbital tablets. After bringing the tablets into the house at the request of the decedent, the defendant then gave the decedent a number of these tablets, and in the presence of the defendant, the decedent consumed a substantial number of them within a period of approximately thirty minutes.[4] Later that evening, the decedent lapsed into unconsciousness and subsequently died as a result of a central nervous system depression caused by barbituate intoxication.

---

[3]NRS 200.010 defines murder as follows: "Murder is the unlawful killing of a human being, with malice aforethought, either express or implied . . . ." NRS 200.020(2) provides: "Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." This Court has held that "the presence of a malice is a question of fact which bears directly on the guilt or innocence of a defendant and upon the degree of the crime charged . . . [I]t is a question to be determined by the trier of fact at the trial of the case." Thedford v. Sheriff, 86 Nev. 741, 744, 476 P.2d 25 (1970). And in context of reviewing a conviction for first degree murder, this Court has said concerning the "murder" language found within the involuntary manslaughter statute: "Under this statute the killing of the woman by means employed was murder, even though there was no conscious intent to kill. Malice is implied from the unlawful use of the deadly weapon. Consequently, the evidence as to his condition, due to intoxication, was immaterial, except as to whether the killing was willful . . . ." State v. Fisko, 58 Nev. 65, 77, 70 P.2d 1113 (1937).

[4]There was conflicting testimony as to whether the decedent in *Cline* consumed 15 or 58 tablets, but in any event expert testimony indicated that a dosage of over five tablets (10 grains) would be extremely dangerous and would be likely to cause death or serious bodily injury. *Id.* at 460-461.

Notwithstanding the fact that California lacked a specific statutory provision for felony-murder in the second-degree,[5] the court went on to hold that such a concept was "imbedded" in the law. In so holding, the court recognized some limitations in the applicability of the doctrine:

> "[A] homicide that is a direct causal result of the commission of a felony inherently dangerous to human life . . . constitutes at least second degree murder." However, there can be no deterrent where the felony is not inherently dangerous, since the potential felon will not anticipate that any injury or death might arise solely from the fact that he will commit the felony. [Citations omitted.]
>
> . . .
>
> Only such felonies as are in themselves "inherently dangerous to human life" can support the application of the felony-murder doctrine.

*Id.* at 461-462. The California court then affirmed the defendant's second degree murder conviction by holding that the act of illegally furnishing a restricted dangerous drug to another is "inherently dangerous to human life."[6] *Id.* at 463.

The second degree felony-murder rule has been followed in other cases. *See, e.g.,* People v. Poindexter, 330 P.2d 763 (Cal. 1958), where a second degree murder conviction was upheld against a defendant who supplied a minor with heroin, the minor having died later of an overdose of the use of that drug. The court held: "Death resulting from the commission of a felony such as furnishing, selling or administering of narcotics to a minor constitutes murder of the second degree. Pen. Code, § 189; People v. Powell, 34 Cal.2d 196, 205, 208 P.2d 974." *Id.* at 767.

Further, the concept is not unique to California jurisdictions. *See, e.g.,* People v. Johnson, 329 N.Y.S.2d 265 (1972); Jenkins v. State, 230 A.2d 262, 267-269 (Del. 1967), *reh'g denied,* 396 U.S. 995 (1969); wherein the Delaware Supreme Court expounded upon the second degree felony-murder rule in the context of a felony not related to the sale of drugs:

---

[5]Similar to Nevada law, the court recognized that the California Penal Code did not expressly set forth any provision for second degree felony-murder, but rather provided: "All kinds of murder other than those specified as first degree are murder of the second degree." (Pen. Code, § 189). *Id.* at 461.

[6]It is interesting to note that both phenobarbital (the non-narcotic drug in *Cline*) and chloral hydrate (the drug in the present case) are controlled substances in Nevada and classified as Schedule IV drugs under NRS 453.196.

Under the common law felony-murder rule, any homicide committed in the perpetration of any felony constituted murder . . . .

The felony-first degree murder rule is expressly limited by Statute to three felonies . . . . The defendant contends that the enumeration of three types of felonies . . . manifests a legislative intent to abolish the felony-murder rule as to all other felonies. We disagree.

A felony-second degree murder rule has long been recognized in Delaware . . . . [Citations omitted.]

We conclude that . . . the General Assembly intended to prescribe the scope of the felony-first degree murder rule; that the long-standing felony-second degree murder was not abrogated by the Statute.

. . .

The California rule has been stated as follows: a homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (except felonies enumerated in the first degree murder statute) constitutes at least second degree murder. [Citations omitted.]

In our judgment, the California rule is supported by logic, reason, history, and common sense.

. . .

It is the opinion of the Court, therefore, that the felony-second degree murder rule of this State should be limited to homicides proximately caused by the perpetration or attempted perpetration of felonies which are, by nature or circumstances, foreseeably dangerous to human life, whether such felonies be common law or statutory.

The defendant directs our attention to cases which assertedly support his position. In State v. Mauldin, 529 P.2d 124 (Kan. 1974), the court held that the selling of heroin to a purchaser who subsequently injected the heroin into his body and died as a result thereof, did not invoke the application of the felony-murder rule so as to constitute *first* degree murder. In so holding, the court placed great importance on factors of "time" and "causation" under circumstances (unlike the California cases) where the overdose was not taken with the assistance of the seller nor in his presence. The court not only determined there was no causal connection between the commission of the felony and the resulting death, but further believed that any such expansion of the felony-murder rule was a function for the legislature, not the judiciary. *Id.* at 126-127.

Similarly, in State v. Dixon, 511 P.2d 623 (Ariz. 1973), the court held that the sole act of selling heroin to a purchaser, who (out of the presence of and without assistance of the seller)

injected the heroin into his body and died as a result thereof did not constitute second degree murder. In so holding, the court said:

> The legislature, after considering whether to enact the common law felony murder rule, limited it to homicides occurring during the commission of arson, rape, robbery, burglary, or mayhem. It then added that all other kinds of murder are of the second degree. It did not provide that homicides committed during all unnamed felonies were second degree murders. We think that the language used was used advisedly.

*Id.* at 625. The defendant also places great significance upon this Court's holding in Catania v. State Farm Life Ins. Co., 95 Nev. 532, 598 P.2d 631 (1979). Defendant's reliance is misplaced. The Court's holding did nothing more than construe the terms of an insurance policy in the context of an unintended death resulting from self-injected heroin. Furthermore, in both State v. Mauldin, *supra,* and State v. Dixon, *supra,* there were no statutes expressly providing, as in Nevada, that when an "involuntary killing occurs in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense is murder."

Under Nevada law, the unauthorized selling of chloral hydrate tablets is a felony.[7] The degree of the crime is undoubtedly commensurate with the degree of danger confronting persons who take such drugs from unauthorized sources. If the evidence supports the state's allegations, defendant sold, with felonious intent, dangerous drugs to young Slotemaker. Additionally, the defendant actually participated in the process of overdosing the decedent as did the defendant in *Cline.*[8]

It is a fundamental principle of statutory construction that where at all possible, statutes should be construed so as to give effect to the legislative intent. White v. Warden, 96 Nev. 634, 614 P.2d 536 (1980); Woofter v. O'Donnell, 91 Nev. 756, 542 P.2d 1396 (1975). It is equally fundamental that statutes should be construed in order to validate each provision of the statute. White v. Warden, *supra;* A Minor v. Clark Co. Juvenile Ct.

---

[7]NRS 453.321, NRS 453.191.

[8]Here, the medical examiner testified before the grand jury that the level of trichloral ethanol found in the decedent was a lethal dose of "77.5 micrograms per milliliter [which] is about ten to twelve times the amount . . . expect[ed] from an ordinary dose when one uses chloral hydrate as a sleeping pill." The actual number of tablets consumed in the presence of the defendant would, of course, be a question for the trier of fact.

Servs., 87 Nev. 544, 490 P.2d 1248 (1968). Here, it is apparent that the legislature intended that every involuntary killing which occurs in the prosecution of a felonious intent or which happens in the commission of an unlawful act which, in its consequences, naturally tends to destroy a human life is *murder*. The legislature has also specified that all murder excepting that identified as first degree shall be of the second degree. We may not conclude, therefore, that one who feloniously sells and participates in the administration of lethal dosages of controlled substances to a minor is outside the intended purview of the subject statutes. To the contrary, under the factual setting here present, a trier of fact could justifiably conclude that the 17-year old Slotemaker was killed because of the unlawful act of the defendant in selling and participating in the administration of drugs which are naturally life-threatening. The trier of fact, properly instructed, could also conclude that Slotemaker was killed in the prosecution of a felonious intent by the defendant.

We are not unmindful of the potential for untoward prosecutions resulting from this decision. We therefore emphasize that our holding today is limited to the narrow confines of this case wherein we perceive an immediate and direct causal relationship between the actions of the defendant, if proved, and the minor's demise. Further, in line with the decision in People v. Satshell, 489 P.2d 1361 (Cal. 1971), we hold that a felony which would support the application of this second degree felony murder rule, would have to be one which is inherently dangerous when viewed in the abstract. There can be no deterrent value in a second degree felony murder rule unless the felony is inherently dangerous since it is necessary that a potential felon foresees the possibility of death or injury resulting from the commission of the felony. People v. Cline, *supra*.

In the present action, if the facts as alleged are proved a second degree felony murder instruction consistent with this opinion may be appropriately applied to defendant's conduct. First, it must be established by the evidence that the unauthorized sale and ingestion of chloral hydrate in the quantities involved are inherently dangerous in the abstract, *i.e.,* without reference to the specific victim. Second, there must be an immediate and causal relationship between the felonious conduct of the defendant and the death of the minor, Slotemaker. By the term "immediate" we mean without the intervention of some

other source or agency. Third, the causal relationship must extend beyond the unlawful sale of the drugs to an involvement by commission or omission in the ingestion of a lethal dosage by the decedent. This element of the rule would be satisfied by the unlawful selling or providing of the drugs and helping the recipient of the drugs to ingest a lethal dose or by unlawfully selling or dispensing the drugs and being present during the consumption of a lethal dose. Thus, absent more, the rule would not apply to a situation involving a sale only or a sale with a nonlethal dosage ingested in the defendant's presence. Although it may be cogently argued that an unlawful sale of drugs is inherently dangerous per se, and therefore an appropriate basis for a charge of murder when death occurs, we leave such a determination to the legislature.[9]

[Headnote 10]

Our holding with respect to that portion of NRS 200.070 dealing with felonious intent applies with equal force to the unlawful act provision of the statute. In other words, in the context of an unlawful sale of controlled substances resulting in death, the state must prove its case in accordance with the same guidelines applicable to the second degree felony murder rule. The particular nature and quantity of the drug must be shown to be inherently dangerous in the abstract, and there must be an immediate and causal relationship between the sale or dispensing of the drug and the death of the victim as hereinbefore defined.[10]

We must now consider defendant's argument that the "and/or" approach used in the indictment violates the rule of this Court established in Simpson v. District Court, 88 Nev. 654, 503 P.2d 1225 (1972). In *Simpson,* this Court held that an indictment for murder is not sufficient "when it alleges nothing whatever concerning the means by which the crime was committed." *Id.* at 655. *Simpson* was founded upon "the threats to due process that indefinite indictments necessarily pose" by not entitling an accused "to be informed of the nature and cause of the accusation." *Id.* at 655-656. This Court said:

---

[9]In at least one jurisdiction, homicides resulting from the unlawful sale of controlled substances have been made, by legislative enactment, a capital offense. Ariz. Rev. Stat. Ann. § 13-1105.

[10]The language of this provision of the statute would suggest that nonfelonious conduct may be all that is required provided the defendant's conduct is "unlawful" and "naturally tends to destroy the life of a human being." Because the present case involves an underlying felony (the sale of the Schedule IV drug), the question of applicability to behavior amounting to less than a felony need not be addressed.

> NRS 173.075(1) expressly provided that the "indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." NRS 173.075(2) indicates this should either include the means by which the offense was accomplished or show means are unknown. [Footnote omitted.] NRS 179.370 likewise recognizes that a proper murder indictment should, among other things, contain some reference to means.

In view of our holding concerning the necessary elements of proof in a criminal prosecution under the subject provisions of NRS 200.070, in the fact-specific setting of this case, it is apparent that the language of the indictment is fatally defective. The non-statutory language of the indictment fails to reference facts regarding defendant's conduct or presence during decedent's ingestion of a lethal dose of the controlled substance. Consequently, the indictment fails to sufficiently apprise the defendant of what he must be prepared to meet. Russell v. United States, 369 U.S. 749, 763 (1962).[11]

Since we have ruled against the sufficiency of the indictment, we must affirm the action taken by the district court. We do so, however, without prejudice to the state's right to seek a new indictment or to proceed by way of a criminal information in accordance with this opinion.

MANOUKIAN, C. J., and MOWBRAY, J., concur.

SPRINGER, J., with whom GUNDERSON, J., agrees, concurring:

I concur with the opinion of the majority except insofar as its dicta purports to create a new crime in this state to be styled, "Second Degree Felony Murder." The trial judge properly held that new crimes should be created by the legislature and not by the court.

In oral argument the state's attorney agreed that it was not necessary to create the proposed new crime and that creation of

---

[11]In this respect, this Court in *Simpson* adopted the following formulation of the law:

Whether at common law or under statute, the accusation must include a characterization of the crime and such description of the particular act alleged to have been committed by the accused as will enable him properly to defend against the accusation, and the description of the offense must be sufficiently full and complete to accord to the accused his constitutional right to due process of law.

a "second degree felony murder" was not necessary for effective prosecution of these kinds of drug cases.[1] I agree with the state's attorney and suggest that it is inappropriate and unnecessary to conjure up this brand new crime.

The defendant in this case can be prosecuted for second degree murder under present law. A second degree murder conviction may result from an unintentional killing when it occurs in the commission of an unlawful act which by its nature tends to destroy human life. NRS 200.070 ("[W]here the involuntary killing occurs in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense is murder."); State v. Hall, 54 Nev. 213, 239, 13 P.2d 624, 632 (1932). Criminal liability for murder can attach in this case if it is established that the unlawful act of furnishing drugs was, under the circumstances of this case, an act which had a natural tendency to destroy human life. Consequently, as conceded by the state at oral argument, there is no need for the accretion of a new crime.

I agree with the majority that there is a "potential for untoward prosecutions resulting from this decision," and believe that this danger presents an additional reason for this court to leave the creation of new crimes to the legislative branch of government.

---

[1]THE COURT:   In this case you don't need a felony murder theory, do you?
COUNSEL FOR THE STATE:   Under these facts I don't think so.
. . .
THE COURT:   Are you receding from your position? Are you suggesting that you, yourself, do not agree that this court should adopt a second degree felony murder rule with respect to drug cases?
COUNSEL FOR THE STATE:   I have to say that if I were sitting where one of you are, I would not do so.
THE COURT:   You have reached the conclusion that we should reject such a theory, correct?
COUNSEL FOR THE STATE:   I think so.