ERIC PAUL NOONAN, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 30021

July 22, 1999

980 P.2d 637

*Michael R. Specchio,* Public Defender, and *John Reese Petty,* Deputy Public Defender, Washoe County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Richard A. Gammick,* District Attorney, *Daniel Greco* and *Terrence P.*

*McCarthy,* Deputy District Attorneys, Washoe County, for Respondent.

Before YOUNG, SHEARING and LEAVITT, JJ.

## OPINION

*Per Curiam:*

Appellant Eric Paul Noonan was found guilty of second degree murder by a jury and sentenced to a prison term of twenty-five years, with parole eligibility after a minimum of ten years, for the murder of Taylor Savannah Buttacavole. Additionally, Noonan was ordered to pay restitution in the amount of $9,291.98. Noonan appeals the judgment of conviction.

### FACTS

Noonan was responsible for watching several children, including sixteen-month-old Taylor, at his residence in Reno. On the morning of February 26, 1996, Taylor's father, Donald Buttacavole, dropped Taylor off at Noonan's home at approximately 6:30 a.m., and she appeared in good health. At approximately 11:50 a.m., Kenneth Fairer, a dispatcher at REMSA paramedics, received a call from Noonan's address requesting an ambulance. REMSA dispatched a team to Noonan's home, responding to a call of a child in "full arrest." A team of firefighters, including Patrick Luna and Brian Spell, was the first to arrive on the scene. They found Taylor lying on the living room

floor wearing a jumper with a tee shirt underneath. Luna testified that when he touched Taylor to obtain a pulse, he was shocked by the ''intense coldness'' of her body. Her breathing was labored and her pupils were fixed and dilated. Taylor's skin tone looked normal, she appeared dry, and there were no signs of physical abuse on her body.

Noonan explained to Spell that he had given Taylor a bottle of milk approximately one hour before the firefighters and paramedics arrived and then had put her down for a nap. Approximately thirty to forty-five minutes later he checked on her, and she was not breathing. Noonan attempted CPR and then called 9-1-1. Noonan told a paramedic that he fed Taylor a couple of bottles of milk, put her down for a nap, and ten minutes later found her in her crib, blue and ice cold. He then called 9-1-1.

When the paramedics, Mark Gabites and Mike Crabbe, arrived they found Taylor taking labored breaths and noticed that she was very pale. Gabites and Crabbe touched her and she felt extremely cold. Taylor's heart rate was very low, and Gabites described her eyes as glazed. Gabites attempted to intubate her, but was unable to because her jaw was locked. The paramedics observed no signs of abuse or trauma.

When police officer Daniel Hunter arrived, Noonan identified himself as Dylan Clunie, Noonan's half-brother. Noonan told Hunter that he found Taylor in her crib, blue and not breathing, and called 9-1-1.

The paramedics took Taylor to Washoe Medical Center. A registered nurse at the medical center noted that Taylor felt extremely cold, her breathing was labored, and she was unresponsive to external stimuli. Her temperature was eighty-one degrees, and she was pronounced dead at 2:05 p.m. The cause of death was certified as hypothermia.

Detective John Douglas of the Reno Police Department was sent to the medical center to investigate Taylor's death. Noonan again identified himself as Dylan Clunie, and produced Dylan's driver's license. Noonan agreed to accompany Detective Douglas to the Reno Police Department. While there he recounted that he gave Taylor a bath around 9:00 a.m., and then two bottles between 10:30 and 10:45 a.m. He checked her at 11:00 and 11:15 a.m., and she was fine both times. Noonan stated that he went to a nearby school to pick up another child he watched, and was gone a maximum of two minutes. Upon his return he began preparing lunch, and checked Taylor in her playpen. He noticed that she looked blue, and called for an ambulance. After recounting the incidents prior to Taylor's death, Noonan told police his real name.

Noonan's trial testimony differed from what he had told the firemen, paramedics, and police officers on the day of Taylor's death. He admitted lying to police and stated that he did so because he panicked. He testified that he gave Taylor a bath at approximately 10:45 or 10:55 a.m., periodically checking on her while he prepared lunch. While Taylor was in the bathtub, Noonan left to pick-up another child at the child's school. Noonan left for the school at approximately 11:15 a.m. The testimony concerning the time it took to get from Noonan's home to the school varied from five minutes, to five minutes forty-five seconds, to eight minutes. Noonan waited at the school for at least five minutes, before starting for home. The snow was deep and he had to carry the child part of the way, but they eventually raced each other back home.

When Noonan arrived at his home he heard the water running and found Taylor in the bathtub, floating on her back. He grabbed her, turned the water off, felt that she was ice cold, and called 9-1-1. He attempted CPR on Taylor, and turned up the heater.

The district court instructed the jury on first and second degree murder, second degree felony murder, and involuntary manslaughter. The jury returned a guilty verdict of second degree murder. The district court sentenced Noonan to a term of twenty-five years with eligibility for parole beginning when a minimum of ten years had been served. This timely appeal followed.

## DISCUSSION

On appeal Noonan contends that the district court erroneously instructed the jury on a theory of second degree felony murder because the information filed against him is devoid of a felony murder theory. We conclude that the instruction was properly given.

The information filed against Noonan alleged, in pertinent part, that Eric Paul Noonan committed the crime of:

> MURDER, a violation of NRS 200.010 and NRS 200.030, a felony, in the manner following:
>
> That the said defendant ·on the 26th day of February . . . 1996 . . . did willfully, unlawfully and with malice afore-thought, deliberation, and premeditation kill TAYLOR SAVANNAH BUTTACAVOLE, a human being, to wit, said defendant submerged the infant in cold water, or placed the child in a freezer or other cold environment, thereby causing the infant's body temperature to lower rapidly, resulting in death by hypothermia; or
>
> That the said defendant did willfully, unlawfully, and with malice aforethought, kill TAYLOR SAVANNAH BUTTA-

CAVOLE, by means of child abuse, to wit, said defendant submerged the infant in cold water, or placed the child in a freezer or other cold environment, thereby causing the infant's body temperature to lower rapidly, resulting in death by hypothermia . . . .

Noonan maintains that the following instruction was improper because the information failed to provide him with notice that he was charged with felony murder:

If the killing is the result of the commission of a Felony that is inherently dangerous to human life, then the killing is second degree murder.

Willful endangerment or Neglect of a Child Resulting in Substantial Bodily Harm is a Felony.

The elements of this Felony offense are that:

(1) The Defendant did willfully, and unlawfully;

(2) While responsible for the safety or welfare of a child under the age of 18 years,

(3) Permit or allow that child to suffer unjustifiable physical pain or mental suffering as a result of neglect, or to be placed in a situation where the child may suffer physical pain or mental suffering as a result of neglect.

In Alford v. State, 111 Nev. 1409, 1412, 906 P.2d 714, 715 (1995), this court held that the State is required to charge felony murder and its attendant facts in an indictment or information if it chooses to pursue a murder conviction on the basis of the felony murder rule. However, that case is inapplicable to this appeal. In this case, the State had no reason to specifically allege the underlying felony of willful endangerment or neglect resulting in substantial bodily harm until Noonan testified at trial. Even so, the information alleges the basic facts supporting the second degree murder conviction based on willful endangerment or neglect. Noonan had notice of the factual allegations against him and could defend himself against those allegations. The only difference in the ultimate charge from what the information charged is that the information charged intentional killing and the ultimate conviction was for intentional endangerment.

Noonan's initial statements did not indicate intentional endangerment. The district court found that Noonan told police and emergency personnel that he gave Taylor a warm bath, dried her off, dressed her in warm clothing, placed her in her playpen in a room with a temperature of seventy to seventy-five degrees, and found her later extremely cold and not breathing. However, at trial Noonan testified that he left Taylor alone in the bathtub for twenty-five to thirty minutes, and when he returned, the water

was running and Taylor was floating on her back, extremely cold. This new testimony clearly supported intentional endangerment.

Furthermore, Noonan insisted on, and received, an instruction on involuntary manslaughter. The statutory definition of involuntary manslaughter in NRS 200.070 includes the language "but where the involuntary killing occurs in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, . . . the offense is murder." This is precisely the crime of which Noonan was convicted. We conclude that the felony murder instruction was proper.

An additional issue is whether felony child neglect can support a conviction for second degree felony murder. The leading Nevada case on the issue of second degree felony murder is Sheriff v. Morris, 99 Nev. 109, 118, 659 P.2d 852, 859 (1983), where this court stated:

> [W]e hold that a felony which would support the application of this second degree felony murder rule, would have to be one which is inherently dangerous when viewed in the abstract. There can be no deterrent value in a second degree felony murder rule unless the felony is inherently dangerous since it is necessary that a potential felon foresees the possibility of death or injury resulting from the commission of the felony.

(citation omitted).

We conclude that leaving a sixteen-month-old child alone in a bathtub for twenty-five to thirty minutes is inherently dangerous and Noonan should have foreseen the possibility of death or injury resulting. Similarly, we perceive an immediate and direct causal relationship between Noonan's acts and Taylor's demise. Thus, we hold that under *Morris* the second degree felony murder conviction was supported by the evidence of Noonan's actions.

Noonan's final argument is that Nevada's reasonable doubt instruction, codified in NRS 175.211(1), violates the due process clauses of both the federal and state constitutions. This court has affirmed the constitutionality of the instruction on several prior occasions. *See* Chambers v. State, 113 Nev. 974, 944 P.2d 805 (1997); Evans v. State, 112 Nev. 1172, 926 P.2d 265 (1996); Quillen v. State, 112 Nev. 1369, 929 P.2d 893 (1996); Bollinger v. State, 111 Nev. 1110, 901 P.2d 671 (1995). Further, in Ramirez v. Hatcher, 136 F.3d 1209 (9th Cir.), *cert. denied,* 525 U.S. 967 (1998), the United States Court of Appeals for the Ninth Circuit upheld the constitutionality of NRS 175.211(1).

Therefore, we conclude that Noonan's argument that Nevada's reasonable doubt instruction violates his federal and state due process rights lacks merit.

In conclusion, we hold that the jury instructions in this case were correct. Accordingly, we affirm Noonan's judgment of conviction.