FELICIA GARCIA RAMIREZ, Appellant, *v.*
THE STATE OF NEVADA, Respondent.

No. 46417

July 1, 2010                                        235 P.3d 619

*Karla K. Butko*, Verdi, for Appellant.

*Catherine Cortez Masto*, Attorney General, Carson City; *Richard A. Gammick*, District Attorney, and *Joseph R. Plater*, Deputy District Attorney, Washoe County, for Respondent.

## OPINION

By the Court, PARRAGUIRRE, C.J.:

In this appeal, we consider whether the jury was properly instructed on the offense of second-degree felony murder by means of child neglect or endangerment. For the reasons outlined in this opinion, we conclude that the jury was not completely and accurately instructed as to the necessary elements of second-degree felony murder and that the improper instruction affected appellant Felicia Ramirez's substantial rights. Accordingly, we reverse the district court's judgment of conviction and remand this matter for a new trial.[1]

### FACTS AND PROCEDURAL BACKGROUND

Appellant Felicia Ramirez and her boyfriend, Joel Aponte, were each charged with alternative counts of first-degree felony murder by means of child abuse and second-degree felony murder by means of child neglect or endangerment based on the death of their 16-day-old daughter, Trinity. Ramirez and Aponte had two children together, another daughter and newborn Trinity.

At trial, expert testimony established that Trinity's death was the result of about 12 blows to the head with a blunt object no more · than 12 hours before she was declared dead. She also had two small fractures to the back left ribs. Evidence at trial established that the child had been exclusively in the care of Aponte and Ramirez during that 12-hour time frame, and a pediatrician testified that Trinity was in good health a few days before her death. Aponte and Ramirez were arrested and charged approximately nine months after Trinity's death.

Shortly before their trial, Aponte reached a plea agreement with the State. He agreed to plead guilty to child neglect or endangerment resulting in substantial bodily injury or death in exchange for testifying against Ramirez. At trial, Aponte testified that when he returned home around 5 or 5:30 p.m. on the evening that Trinity

---

[1]In addition to the specific challenges addressed in this opinion, Ramirez contends that her conviction should be reversed on the grounds that (1) her Confrontation Clause rights were violated; (2) the district court erred by admitting prior bad act evidence; (3) the State failed to disclose evidence that was to be used at trial; (4) certain taped telephone conversations should not have been admitted based on hearsay grounds; and (5) the jury should have been provided instructions regarding malice, accomplice testimony, and the lesser included offense of felony child neglect or endangerment causing substantial bodily harm. Separately, Ramirez argues that because she never explicitly waived her right to jury sentencing, her sentence should be vacated and remanded.

We do not address Ramirez's remaining challenges because of our decision to reverse her conviction on the basis set forth in this opinion.

died, Trinity was pale and lethargic, but he saw no other signs of distress. Ramirez asked him to check on Trinity several times that night when she thought she heard Trinity crying. When he checked on Trinity around 9 or 9:30 p.m., she was not breathing.

He also testified to two incidents indicating that Ramirez was violent, suicidal, and did not want any more children. According to Aponte, when Ramirez was pregnant with Trinity, she arrived at his house drunk, began yelling that she did not want to live anymore or deal with another child, threatened to kill herself and their children, hit herself in the stomach, threw herself against a set of concrete stairs, and lay in the street saying she would let the cars run over her. He further testified that on another occasion after Trinity's birth, Ramirez responded to Aponte's decision to leave her by yelling, throwing things, and saying that she did not want to be a mother or to live anymore.

Ramirez testified that she was home alone with Trinity from 10 a.m. to 5 p.m. on the day Trinity died and that Trinity had been fussy, irritated, and a little sick with a cold. When Aponte arrived home at 5 p.m., Trinity was asleep on the couch. According to Ramirez, she and Aponte watched a basketball game while Trinity slept on the couch and then, while Ramirez made popcorn, Aponte put Trinity to bed. Aponte then checked on Trinity a few times after that. Ramirez testified that she did not hurt Trinity and did not see Aponte hurt Trinity.

Ramirez also explained that she attempted suicide about eight months after Trinity's death because Aponte left her, Trinity was dead, and their other daughter had been taken by child services. Ramirez told the jury that she did not know she was pregnant with a third child at the time of the suicide attempt. She also explained that she was referring to Aponte leaving her, Trinity's death, and her other child being taken away by child services when she said that she was "sorry for what [she] did," that she had "failed as a mother and a girlfriend," and that "[i]t's all my fault" in her suicide note.

Ramirez testified about her relationship with Aponte and his interaction with their children. In particular, she testified that Aponte was physically and emotionally abusive to her and that he had not been very interested in raising their two children. While Aponte would help with the children sometimes when asked, he was resistant and would get frustrated quickly, calling Trinity names when she cried. Ramirez testified that Aponte would say, "that bitch cries too much" and instruct Ramirez to "shut the bitch up."

Two witnesses testified about Aponte's and Ramirez's demeanor on the night of Trinity's death. The first paramedic responding to Ramirez's 9-1-1 call testified that Aponte was hysterical but that Ramirez did not cry. Similarly, the coroner's investigator who

picked up Trinity's body at the hospital testified that Aponte was crying but Ramirez was not.

The jury acquitted Ramirez of first-degree felony murder by means of child abuse but found her guilty of second-degree felony murder by means of child neglect or endangerment. The district court subsequently sentenced Ramirez to a term of life imprisonment with the possibility of parole after ten years. This appeal followed.

## DISCUSSION

*The jury was not completely and accurately instructed on the offense of second-degree felony murder by means of child neglect or endangerment*

Although she failed to object at trial, Ramirez now contends that the jury was not completely and accurately instructed on the necessary elements of second-degree felony murder by means of child neglect or endangerment. We agree that the jury was not properly instructed as to all the necessary elements of second-degree felony murder. And because we conclude that the error affected Ramirez's substantial rights, we reverse the judgment of conviction and remand for a new trial despite Ramirez's failure to object to the instruction below.

### The offense of second-degree felony murder

We first recognized the substantive offense of second-degree felony murder in *Sheriff v. Morris*, 99 Nev. 109, 659 P.2d 852 (1983). In *Morris*, we concluded that Nevada's involuntary manslaughter statute, NRS 200.070, when read in conjunction with Nevada's murder statute, NRS 200.030(2), permitted the offense of second-degree murder under the felony-murder rule. *See id.* at 113, 117-18, 659 P.2d at 856, 858-59.

This court, however, was mindful "of the potential for untoward prosecution resulting from th[at] decision." *Id.* at 118, 659 P.2d at 859. As a result, we specifically limited application of the second-degree felony-murder rule to the "narrow confines of this case wherein we perceive an immediate and direct causal relationship between the actions of the defendant, if proved, and the [victim's] demise." *Id.* We defined the term "immediate" to mean "without the intervention of some other source or agency." *Id.* at 118-19, 659 P.2d at 859. We further limited the application of the rule to felonies that are inherently dangerous when viewed in the abstract. *Id.* at 118, 659 P.2d at 859. We recognized that "[t]here can be no deterrent value in a second degree felony murder rule unless the felony is inherently dangerous since it is necessary that a potential felon foresees the possibility of death or injury resulting from the commission of the felony." *Id.*

Later, in *Labastida v. State*, we reaffirmed our narrow and limited holding in *Morris*, and succinctly stated that the second-degree felony-murder rule only applies when the following two elements are satisfied: (1) ''where the [predicate] felony is inherently dangerous, where death or injury is a directly foreseeable consequence of the illegal act,'' and (2) ''where there is an immediate and direct causal relationship—without the intervention of some other source or agency—between the actions of the defendant and the victim's death.'' 115 Nev. 298, 307, 986 P.2d 443, 448-49 (1999) (citing *Morris*, 99 Nev. at 118, 659 P.2d at 859). Because we have repeatedly expressed disapproval at the potential for untoward prosecutions resulting from our decision to recognize the second-degree felony-murder rule and consciously limited application of the rule, these two elements are critical to any second-degree felony-murder jury instruction.

*The jury was not properly instructed on the immediate-and-direct-causal-relationship element*

The district court instructed the jury that the State must prove the following four elements to support a conviction for second-degree felony murder: (1) Ramirez ''did willfully and unlawfully'' (2) ''permit or allow'' Trinity (3) ''to suffer unjustifiable physical pain as a result of neglect or endangerment,'' and (4) Trinity ''died as a foreseeable consequence of the neglect or endangerment.''

By instructing the jury that the State must prove that Trinity ''died as a foreseeable consequence of the neglect or endangerment,'' the jury was properly instructed on the inherently dangerous element.[2] *See, e.g.*, *Labastida*, 115 Nev. at 307, 986 P.2d at 448-49. However, in reviewing the instruction, it is clear that the

---

[2]The question of whether a felony is inherently dangerous, where death or injury is a directly foreseeable consequence of the illegal act, is a question for the jury to determine under the facts and circumstances of each case. Although our caselaw suggests that we look to whether a felony is inherently dangerous in the abstract, *see, e.g.*, *Morris*, 99 Nev. at 118, 659 P.2d at 859; *Noonan v. State*, 115 Nev. 184, 189, 980 P.2d 637, 640 (1999); *Labastida*, 115 Nev. at 307, 986 P.2d at 448, in practice this question has consistently been analyzed by looking to the manner in which the felony was committed. *See Morris*, 99 Nev. at 118, 659 P.2d at 859 (stating that under the facts of the case, the unauthorized sale of a controlled substance was inherently dangerous); *Noonan*, 115 Nev. at 189, 980 P.2d at 640 (concluding that ''leaving a sixteen-month-old child alone in a bathtub for twenty-five to thirty minutes [was] inherently dangerous''). Therefore, in reconciling these conflicting approaches, we abandon any suggestion that we should look at the felony in the abstract to determine whether it is inherently dangerous in favor of our practice of looking to the

jury was not instructed that there must be an immediate and direct causal connection between Ramirez's unlawful act or acts and Trinity's death. Therefore, we conclude that Ramirez was not provided a complete and accurate instruction on the offense of second-degree felony murder.

*The incomplete instruction affected Ramirez's substantial rights*

Even though the jury was not instructed on the necessary elements for the crime of second-degree felony murder, because Ramirez did not object to the incomplete and inaccurate instruction at trial, reversal is only required if the error is plain from a review of the record and affected Ramirez's substantial rights. *See Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008); NRS 178.602; *see also* NRS 177.255. "Under th[is] standard, an error that is plain from a review of the record does not require reversal unless the defendant demonstrates that the error affected his or her substantial rights, by causing actual prejudice or a miscarriage of justice." *Valdez*, 124 Nev. at 1190, 196 P.3d at 477 (internal quotations omitted).

While the failure to provide the specific elements of second-degree felony murder under *Morris* and *Labastida*, standing alone, might not amount to plain error, we conclude that Ramirez's substantial rights were affected by the improper instruction because (1) the State failed to specify the felony under which it sought a second-degree felony-murder conviction and, thus, Ramirez could have been convicted of second-degree felony murder under a potentially invalid predicate offense; and (2) there was conflicting evidence as to whether Ramirez or Aponte inflicted Trinity's mortal wounds.

*The State failed to specify the predicate felony to support a second-degree felony-murder conviction*

Nevada's felony offense of child neglect and endangerment, NRS 200.508, provides that a person can be held criminally liable for both willful and passive neglect or endangerment. Under NRS 200.508, a person is guilty of neglect or endangerment if he or she either (1) "*willfully causes* a child . . . to suffer unjustifiable

---

manner in which the felony was committed, which happens to be the preferred approach. *See, e.g.*, 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.5(b), at 447-48 (2d ed. 2003); *State v. Stewart*, 663 A.2d 912, 919 (R.I. 1995) ("[T]he better approach [rather than viewing the elements of the felony in the abstract] is for the trier of fact to consider the facts and circumstances of the particular case to determine if such felony was inherently dangerous in the manner and the circumstances in which it was committed.").

physical pain or mental suffering as a result of . . . neglect[3] or to be placed in a situation where the child may suffer physical pain or mental suffering as the result of . . . neglect," or (2) "is responsible for the safety or welfare of a child and . . . *permits*[4] or *allows*[5] that child to suffer unjustifiable physical pain or mental suffering as a result of . . . neglect or to be placed in a situation where the child may suffer physical pain or mental suffering as a result of the . . . neglect." NRS 200.508(1) and (2) (emphases added).

Whereas NRS 200.508(1) addresses scenarios where the person charged under the statute directly committed the harm, NRS 200.508(2), by contrast, addresses situations where a person who is responsible for the safety and welfare of a child fails to take action to protect that child from the abuse or neglect of another person or source. NRS 200.508(2) does not require that the person directly inflict the harm to be found guilty of child abuse or neglect. As a result, in many instances, NRS 200.508(2) cannot serve as a predicate felony to second-degree felony murder. *Cf. Labastida*, 115 Nev. at 307, 986 P.2d at 449 (concluding that Labastida's commission of child neglect under NRS 200.508(2) could not support her second-degree murder conviction because her husband was the person who committed the harm).

Here, the State charged Ramirez with second-degree felony murder under NRS 200.508 generally, without distinguishing between subsections 1 and 2. Further confusing the matter, the State charged that Ramirez did "willfully and unlawfully . . . permit or allow [Trinity] to suffer unjustifiable physical pain as a result of abuse or neglect," including the "willful" language from NRS 200.508(1), and the passive "permit" or "allow" language from NRS 200.508(2).

Because the State's charging document and the instruction submitted to the jury contained language from both NRS 200.508(1) and NRS 200.508(2), the jury was not specifically instructed as to the predicate felony under which the State's theory rested. This is particularly important considering that Ramirez could not be found guilty of second-degree felony murder under NRS 200.508(2) in

---

[3]"[N]eglect" is defined as "physical or mental injury of a nonaccidental nature, sexual abuse, sexual exploitation, negligent treatment or maltreatment of a child . . . under circumstances which indicate that the child's health or welfare is harmed or threatened with harm." NRS 200.508(4)(a).

[4]"Permit means permission that a reasonable person would not grant and which amounts to a neglect of responsibility attending the care, custody and control of a minor child." NRS 200.508(4)(c) (internal quotations omitted).

[5]"Allow means to do nothing to prevent or stop the . . . neglect of a child in circumstances where the person knows or has reason to know that the child is . . . neglected." NRS 200.508(4)(b) (internal quotations omitted).

the event that the jury believed that Aponte actually killed Trinity. *See Labastida*, 115 Nev. at 307, 986 P.2d at 448-49 (noting that there must be "an immediate and direct causal relationship—without the intervention of some other source or agency—between the actions of the defendant and the victim's death").

> *There was conflicting evidence as to whether Ramirez or Aponte inflicted Trinity's mortal wounds*

Given the conflicting evidence in this case, which indicated that either Ramirez or Aponte could have inflicted Trinity's mortal wounds, the causal element of second-degree felony murder was critically important. Although there was evidence that Ramirez could have caused Trinity's death (Aponte testified that Ramirez had threatened to kill herself and her children; doctors testified that Ramirez did not show any emotion the night Trinity died; Trinity was in Ramirez's exclusive custody and control for the majority of the time frame during which the mortal injuries were inflicted; Ramirez did not see Aponte hit Trinity; and Ramirez attempted suicide several months after Trinity's death, leaving a suicide note apologizing "for what [she] did"), there was also evidence to the contrary (Aponte cared for Trinity immediately before her death; Ramirez testified that Trinity made an unusual cry when Aponte was attending to her; and Aponte would get frustrated with the baby and call the baby names). Because of this conflicting evidence, we cannot be certain that the jury determined that Ramirez was the immediate and direct cause of Trinity's death.[6]

As a result of these two considerations, we conclude that the improper jury instruction was prejudicial and affected Ramirez's substantial rights. Accordingly, we reverse the district court's judgment of conviction and remand this matter for a new trial.[7]

HARDESTY, DOUGLAS, CHERRY, SAITTA, GIBBONS, and PICKERING, JJ., concur.

---

[6]The importance of the immediate-and-direct-causal-relationship element is further supported by the fact that the jury acquitted Ramirez of first-degree felony murder by means of child abuse.

[7]While we agree that Ramirez's conviction should be reversed and remanded for the reasons expressed above, we do not agree with Ramirez's contention that her conviction should be reversed for insufficient evidence.