An unpublished order shall not be regarded as precedent and shall not be cited as legal authority. SCR 123.

IN THE SUPREME COURT OF THE STATE OF NEVADA

JUSTIN CHARLES CARRIGAN,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 64446

FILED

APR 2 9 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
DEPUTY CLERK

*ORDER OF AFFIRMANCE*

This is an appeal from an amended judgment of conviction, pursuant to a jury verdict, of child neglect or endangerment with substantial bodily harm. First Judicial District Court, Carson City; James Todd Russell, Judge.

First, appellant Justin Charles Carrigan contends that insufficient evidence was adduced to support the jury's verdict. Carrigan claims that the State failed to demonstrate that his delay in seeking medical treatment for his nonresponsive, 3-year-old stepdaughter, amounted to negligent treatment or maltreatment or that the delay resulted in substantial bodily harm. We disagree with Carrigan's contention because the evidence, when viewed in the light most favorable to the State, is sufficient to establish guilt beyond a reasonable doubt as determined by a rational trier of fact. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Mitchell v. State,* 124 Nev. 807, 816, 192 P.3d 721, 727 (2008).

In order to convict Carrigan of violating NRS 200.508(2)(a)(2), the State was required to prove beyond a reasonable doubt that (1) Carrigan was responsible for the safety or welfare of his stepdaughter; (2) unlawfully and unreasonably permitted or allowed his stepdaughter to (a)

15-12999

suffer unjustifiable physical pain or mental suffering, or (b) be placed in a situation where she may suffer physical pain or mental suffering; (3) due to abuse or neglect; (4) resulting in substantial bodily or mental harm. *See* NRS 200.508(4)(a) (defining "abuse or neglect" in part as negligent treatment or maltreatment of a child under the age of 18 years, as set forth in NRS 432B.140), (b) (defining "[a]llow"), (c) (defining "[p]ermit"); *see also Smith v. State*, 112 Nev. 1269, 1277, 927 P.2d 14, 18 (1996) (explaining that a defendant must know or have reason to know of the abuse or neglect yet permit or allow the child to be subject to it), *abrogated on other grounds by City of Las Vegas v. Eighth Judicial Dist. Court*, 118 Nev. 859, 862-63, 59 P.3d 477, 480 (2002).

Trial testimony indicated that on the morning of September 27, 2010, Carrigan was home caring for his 3-year-old stepdaughter Rochelle and his 1-year-old son Eric, in the apartment he shared with his wife Leah, the mother of both children. At some point that morning, Carrigan found Rochelle nonresponsive.[1] Rather than call 9-1-1, Carrigan left Rochelle and his son unattended and went to a neighbor's residence. Serina Cottiero testified that she lived "[a] block or two away," and that Carrigan arrived between 8:45 a.m. and 9:00 a.m., saying, "he needed somebody over at his house with him right then," though he did not specifically say why. Cottiero followed Carrigan back to his apartment. Cottiero testified that they arrived at Carrigan's apartment approximately

---

[1]Carrigan's accounting varied dramatically: he told various witnesses that after either hearing a "thump" or a "thud" or no sound at all, he found Rochelle either slumped over looking at him, about to fall, or unconscious either in her bedroom, the bathroom, or lying across his lap or chest as he sat on the couch in the living room.

30 seconds later and she found Rochelle lying on the couch in her underwear, looking "really pale," with "mucus or snot like stuff coming out of one of her nostrils." Rochelle was not responsive and did not appear to be breathing. Cottiero attempted "chest compressions and mouth to mouth" in order to resuscitate Rochelle even though Carrigan was trained in CPR due to health issues related to his son.

Rochelle was not breathing and Cottiero told Carrigan to call for an ambulance, however, he refused. Cottiero testified:

> I believe that what was said between us when I asked him to first call an ambulance was that he didn't want to because he had previously, I believe, the night before spanked her for some reason, peeing on him while they were watching a movie or something . . . and he spanked her, and he didn't want someone to think that he did something to her.[2]

Cottiero yelled at Carrigan "over and over" to call for an ambulance and he refused, so she lied and told Carrigan that Rochelle was breathing—"I figured maybe if he thought she was okay more than she was okay that he wouldn't be so worried about calling." Carrigan then called 9-1-1. Cottiero could not be sure but estimated that 3 to 4 minutes elapsed after they arrived at Carrigan's apartment and before he finally called 9-1-1. The 9-1-1 operator instructed Carrigan on how to properly perform CPR and, according to Cottiero, he continued doing that at least until she went outside to get the paramedics' attention. Although Cottiero testified that Carrigan arrived at her house between 8:45 a.m. and 9:00 a.m., and that

---

[2]No evidence of physical trauma or fractures were found by examining doctors at either Renown Children's Hospital (Renown) or Carson-Tahoe Regional Medical Center (Carson-Tahoe).

SUPREME COURT
OF
NEVADA

(O) 1947A

possibly only 3 to 4 minutes elapsed after they returned to Carrigan's residence and before he called 9-1-1, evidence presented at trial indicated that the 9-1-1 dispatch center did not receive Carrigan's call until 9:53 a.m.

Tori Riches, a firefighter-paramedic with the Carson City Fire Department, testified that she and other first responders arrived at Carrigan's residence five minutes after being dispatched. Riches found Rochelle "lying motionless on the ground unconscious, unresponsive." Rochelle was not breathing and did not have a pulse. There was no electrical activity in Rochelle's heart, meaning, "that her heart has not been beating for a period of time, quite awhile." After approximately six minutes performing CPR and administering a second dose of epinephrine, electrical activity resumed and Rochelle's heart began to beat, although she was still unable to breathe on her own.

Meanwhile, as the emergency responders attended to Rochelle, Captain Dan Albee of the Carson City Fire Department made contact with Carrigan to determine what happened and to get as much information as possible in order to provide the most appropriate care. Capt. Albee testified that Carrigan never informed him that between the time he found Rochelle nonresponsive and the time he called 9-1-1 that he left his apartment and the two children unattended, went down the street to Cottiero's residence, returned, and then initially refused to call 9-1-1 before eventually calling after Cottiero insisted. Capt. Albee stated that the omitted information would have been helpful to determine a course of action, especially because "anytime that somebody's gone—is down for up to or more than six minutes, your brain starts to die from lack of oxygen." Sergeant Darren Sloan of the Carson City Sheriff's Department

encountered Carrigan outside the apartment and overheard Carrigan talking to himself, saying "that he was screwed." A bit later, Carrigan looked at Sgt. Sloan and asked "if he was in trouble."

During the course of the investigation, it was soon discovered that Carrigan was less than forthcoming about what transpired on the day in question. Carrigan told emergency responders, investigators, family and friends that after finding Rochelle nonresponsive, he performed CPR and called 9-1-1. Carrigan never told anyone that he left the apartment and his kids unattended and sought out Cottiero after finding Rochelle nonresponsive or that he initially refused to call 9-1-1. It was only while reviewing the 9-1-1 recording that Detective Dina Lacy of the Carson City Sheriff's Department heard a female voice in the background, eventually leading her to discover Cottiero's involvement and the omitted portion of Carrigan's accounting of events.

Dr. Jack Schmurr, an emergency physician at Carson-Tahoe, testified that when Rochelle arrived at the hospital on the morning of the incident, her heart was beating, "[b]ut neurologically, she had no function whatsoever." Dr. Schmurr testified that "any delay of getting oxygen to the brain tissue is going to be catastrophic. . . . In four minutes, it starts to die; in six minutes, damage is done; eight minutes brain death." Dr. Edwin Peters, a pediatric intensive care doctor at Renown, testified that when Rochelle was discharged after two months in the hospital, "[s]he was still severely impaired," "was not communicative," and "unable to eat by herself." Leah Carrigan testified that Rochelle was presently living in a 24-hour nursing home and that she will need supportive care for the rest of her life.

Circumstantial evidence alone may sustain a conviction. *Buchanan v. State*, 119 Nev. 201, 217, 69 P.3d 694, 705 (2003). It is for the jury to determine the weight and credibility to give conflicting testimony, *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992), and a jury's verdict will not be disturbed on appeal where, as here, sufficient evidence supports the verdict, *Bolden v. State*, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981); *see also* NRS 200.508(2)(a)(2), (4). Therefore, we conclude that Carrigan's contention is without merit.

Second, Carrigan contends that the district court violated NRS 173.095(1) and his right to due process by allowing the State to file an amended criminal information which increased the number of charges. Carrigan claims that the amendment of the original criminal information, which charged alternative theories in one count, violated his right to due process "because it cannot be said that the magistrate at the preliminary examination would have found probable cause on Count II"—the count on which he was ultimately convicted.[3] We disagree with Carrigan's contention.

A district judge may allow the prosecution to amend the charging document in a criminal case any time before the verdict so long as "no additional or different offense is charged and [the] substantial rights of the defendant are not prejudiced." NRS 173.095(1). We defer to the district court's decision except when it "manifestly abuses" its considerable discretion. *State v. Eighth Judicial Dist. Court*, 116 Nev. 374, 379, 997 P.2d 126, 129 (2000). Here, there is no indication in the

---

[3]The original criminal information charged Carrigan with violating, in one count, both NRS 200.508(1)(a)(2) and NRS 200.508(2)(a)(2).

record that Carrigan objected to the amended criminal information.[4] *See Grey v. State*, 124 Nev. 110, 120, 178 P.3d 154, 161 (2008) ("Failure to object below generally precludes review by this court; however, we may address plain error and constitutional error *sua sponte*." (internal quotation marks omitted)). Moreover, defense counsel expressly stated at the hearing on his motion to dismiss prior to the filing of the amended information that "[m]y common sense tells me that the solution is to make them divide that single count into two alternative counts." The amended information did not charge Carrigan with an "additional or different offense," the two counts incorporated the same elements as alleged in the original charging document, and Carrigan fails to demonstrate that his substantial rights were adversely affected. Therefore, we conclude that the district court did not abuse its discretion by allowing for the amending of the criminal information.

Third, Carrigan contends that NRS 200.508(2) and (4)(b) are facially void for vagueness "because they fail to delineate the boundaries of unlawful conduct" and unconstitutionally vague as applied to the facts of this case. "We review the constitutionality of a statute de novo, presuming that a statute is constitutional." *Clancy v. State*, 129 Nev. Adv. Op. No. 89, 313 P.3d 226, 231 (2013). We have previously rejected challenges to the constitutionality of Nevada's child-abuse-and-neglect statute, and here, Carrigan fails to demonstrate that NRS 200.508(2) did not provide him with adequate notice that his conduct, as detailed above, "was proscribed by law." *Smith*, 112 Nev. at 1276, 927 P.2d at 18. Additionally,

---

[4]We further note that the amending of the criminal information occurred prior to Carrigan's first trial. The State proceeded with the same charging document, without objection, during Carrigan's second trial.

Carrigan fails to demonstrate that NRS 200.508 is unconstitutionally vague as applied to his case because a person of ordinary intelligence would have fair notice that the delay, as described in this case, in seeking medical attention for an unconscious 3-year-old is allowing the child to suffer unjustifiable physical pain as a result of neglect and is placing her in a situation where she may suffer unjustifiable physical pain. We conclude that Carrigan fails to overcome the statute's presumed constitutionality. Accordingly, we

ORDER the judgment of conviction AFFIRMED.

_____, J.
Saitta

_____, J.
Gibbons

_____, J.
Pickering

cc:   Hon. James Todd Russell, District Judge
      Robert B. Walker
      Attorney General/Carson City
      Carson City District Attorney
      Carson City Clerk